Good morning, everyone. The first case up today is Indiana Protection. Let me get the entire caption here. Indiana Protection and Advocacy Services Commission v. Indiana Family and Social Services Administration at all. We'll be hearing first from the appellant, Ms. Mapes, is that correct? Mapes. Whenever you're ready. Thank you. May it please the court. I am Harmony Mapes, representing the appellants, the Indiana Family and Social Services Administration, or FSSA. We are before the court this morning following a preliminary injunction ruling with respect to one of Indiana's Medicaid home and community-based waivers. The waiver program at issue here, the Health and Wellness Waiver, does not allow the parents of minor children to be paid to provide attendant care to their children. It instead allows them to be providers of a service called Structured Family Caregiving, designed specifically for situations where there's an enrollee that has a live-in caregiver like a parent. The District Court's preliminary injunction ruling, however, ordered the state to violate the terms of its waiver and federal regulations when it ordered FSSA to pay the mothers of the two individual plaintiffs attendant care for their minor children, 84 hours a week for GS and 112 hours a week for ER. Ms. Mapes, can I ask you a quick question? I was trying to decipher this myself and couldn't come up with a definitive answer. Are the services that are previously eligible under the, as categorized as the ATTC, kind of subsumed within the SFC kind of umbrella? So... How are they different or are they the same? Certainly. So ATTC is attendant care and then SFC is the Structured Family Caregiving. Both of them fit the larger umbrella of personal care services, so some of the regulations and the guidance talks about personal care services. Both of them fit into that framework and allow the provider to provide hands-on assistance. Hygiene, mobility, food prep, those sorts of things. There are differences and that Structured Family Caregiving is specifically designed for situations like the ones here where there are parent caregivers. Structured Family Caregiving allows for respite care. It's built in. That does not exist with just the straight-up attendant care services provided by a non-legally responsible individual. There's also training that's involved, understanding who these caregivers are. There's training that's not part of attendant care. There are home visits with nurses or other aides. And then a big difference is how you record your time. Structured Family Caregiving is per diem, whereas attendant care is hourly. And that is designed to fit the situation where you're at home, we understand that you are the caregiver, you may have other children to tend to, other tasks, and you're not required to clock in and clock out as you're switching back and forth between what you're doing. So those are the similarities and the differences. Before digging a little further into the merits, Ms. Mampus, you all had raised a perhaps academic jurisdictional issue. Could you direct me to the language in Rule 65 that requires a preliminary injunction to be in a separate document? Off the top of my head, I cannot do that. I agree with Your Honor that it's an academic issue. Off the top of your head or with all the study in the world you want, you could not. Our case law has made it up. Off the top of my head, I cannot. I understand that's a requirement, and I understand that we believe that requirement has been satisfied here, given the detail in the order. Thank you. Could I ask you on the merits, if I understand the state's mothers or legally responsible individuals were willing and able to provide the attendant care that the plaintiffs are seeking here, the state would be willing to pay those individuals at the ATTC rates, correct? If plaintiffs were seeking that, yes, we would provide the attendant care for a non-LRI to provide the care. So an uncle, a grandmother, a neighbor. Correct. That is allowed under the waiver and what plaintiffs seek is not, and it's prohibited by federal regulation. Well, we'll talk about that in a moment, but why does that make sense? It makes sense because that's what the law is, right? The waiver. Well, the law is a lot, a lot of the law is what FSSA chooses it to be here, in the way the waiver is written and is worked out with the federal government, as we've talked about the state tying its own hands with red tape before, right? So let's talk about what makes, why it makes sense to say we'll pay mothers a hundred-something dollars a day, but we'll pay other relatives and other people 30-something dollars an hour. Certainly, and that comes down in large part to extraordinary care, right? The existing regulation, the existing waiver, the existing CMS guidelines, specifically all say that LRIs are not allowed to provide attendant care unless you go through these many steps. It's not just a simple check the box that plaintiffs suggest. It is an option under the waiver, only if you go through a litany of things, including providing the extraordinary care definition, which requires the state to distinguish between... Have you done so? Has FSSA done so? No, because FSSA has opted not to create a waiver that provides this service. So, but federal law allows payment of the mothers or other legally responsible individuals for extraordinary care, correct? Only under limited circumstances. Only where there is an approved waiver or there's a definition of extraordinary care, which is contemplated to include limits and caps. Those have to be found fiscally sustainable and cost neutral. You would have to go through a notice and comment process. All of these steps to implement and to make what plaintiffs seek legal constitutes a fundamental violation. But none of which the state has actually tried to do in this case, correct? You say you don't want to provide this payment to mothers. I don't think it's a matter of want, Your Honor. The state considered, should we, can we create an extraordinary care definition that would allow for what plaintiffs want? And the answer was no. We've considered this and don't believe we can do this. And how, and is that consideration documented somewhere? So, for example, in discovery, if the plaintiffs were to issue a, you know, document request with regard to the analysis by the agency with regard to this issue, is that in writing somewhere or how would they go about getting that? So what's in the record right now, I can point you to two places. There's a declaration from Kathy Robinson within the agency. It's at docket 38-1. And she explained that if we were to embrace an extraordinary care definition, as CMS suggests, we'd have to put limits on that. And their understanding was we would have such a narrow definition of what's extraordinary care that it would leave individuals, perhaps, without services, which is part of why they opted to go with structured family caregiving. There's also in the waiver itself, right, that you submit to CMS, FSSA acknowledges we considered doing this and we determined such a change was not fiscally sustainable. And so our option for LRI provided care is the structured family caregiving. And we have not gone through these numerous steps that you would have to take that constitute a fundamental alteration to the program as it currently exists. And Ms. Meppis, as a procedural matter, the fundamental alteration kind of defense, would that be considered an affirmative defense where the state bears the burden of proof? On the fundamental alteration piece, yes, Your Honor. There is sort of the flip side of the same coin, which is the third prong of the ADA, which asks is this a reasonable accommodation? We think it's not. What plaintiffs seek is not a reasonable accommodation. We also think giving them what they're seeking would constitute a fundamental alteration. With regard to the argument about fiscally responsible, getting back to what Judge Hamilton was saying, if the state has put aside sufficient money to pay non-LRIs for performing these services, how would limiting the services providers to non-LRIs help the state fiscally? So part of what led to the situation we're in was that, contrary to the waiver, individuals were in fact approved to provide this service, and it became not fiscally sustainable, right? So there isn't money allocated for this, right? Expenditures under the A&D waiver. So I guess I understand that. Both sides have outlined those arguments well in the briefs. I guess my question is, presumably the only way that the state would save money is if they thought that by preventing LRIs from providing intent and care services that they wouldn't get an equal number of claims for non-LRI people to provide the same services. Because if those numbers were equal, then the state would not be saving any money. And my question to you is, has that analysis been done? And if so, where would we be able to find that? If I understand the question, I don't believe that precise analysis has been done. I think that's not what plaintiffs are looking for here, right? They're looking specifically for their mothers to be able to provide. I'm just looking at the fundamental alteration argument, right? You say that it was for fiscal reasons that the state kind of limited the program for LRIs to the structured family care. And I think Judge Hamilton made the point that, well, if it's non-LRIs that are providing the intent and care, then the state would have money to pay. And so presumably, in order to save money, the state did some calculus to conclude that in the latter case of non-LRIs providing intent and services, that that would cost less money than if LRIs were providing intent and services, right? I understand your point. I think part of the issue wrapped into this, when FSSA identified the fiscal concerns, there was an overall re-looking at the program, and there were other issues as well. There were automatic approvals that were happening, right? And we sort of circled back to person-centered planning. Let's make sure people are getting the services that fit best, that are designed for them. And so it's more of a holistic approach. I don't think that the precise numbers you're looking for exist, or at least certainly not in the record. In the current record, where would we be able to find the most detailed articulation by the state, a state witness, as to why they went this route for fiscal purposes? The fiscal piece, a combination of Paul Boling's declaration and Kathy Robison's declaration that I mentioned, and perhaps Cora Steinmetz's as well. Their declarations spell out the fiscal concerns and why FSSA made the choices that it did. So who was the third person? Cora Steinmetz. She's the OMPP director. I will say, Your Honor, I don't think the court has to reach the fiscal question in order to determine that there was a fundamental alteration, right? Plaintiffs are seeking services that do not exist for anybody else. Vaughn has instructed you do not have to go outside the existing services. I think that is not a reasonable accommodation to give to just these two. I think Plaintiff's response is, let's amend the whole waiver. And here our position is, even if you don't reach the fiscal question, the steps that are required constitute a fundamental alteration, even if you don't consider the monetary component. You would have to amend the existing waiver. So you have to provide a definition of extraordinary care. You have to determine what other limitations go on the service, right? CMS has suggested, right, you need other limitations to differentiate between ordinary care and extraordinary care, right? From the CMS technical guidance on page 120, they specifically suggest a safeguard that would limit the amount of services that a legally responsible individual may furnish. Their suggestion in the guidance is to limit it to no more than 40 hours a week and, quote, So you have to amend the waiver, provide the extraordinary care definition, figure out, okay, what caps, what limits do we need to put on this to fit within CMS framework? You have to ensure that the waiver is fiscally sustainable. But I guess I'm having trouble with this, Ms. Mappas, because as I understand it, it's the state that is changing the status quo here. That is, in these two families, the mothers were providing, I'll call it extraordinary care by at least a layman's definition. And then the state decided to make changes in the program and in the funding. And now you're saying it's too much work. It would be a fundamental alteration basically to restore the way things were before this policy change. Is that right? FSSA's position is restoring things to the way they were before is not an option. FSSA That is, however, I have described the history correctly. You've described the history except what was happening before was not fiscally sustainable and it was in violation of the waiver, right? Was there You have to be able to fix mistakes and go back and realize that. I also think assuming that what mothers are providing is necessarily going to be extraordinary care completely nullifies the well-established dance that goes back and forth between CMS and the federal government. Even if you assume, okay, what they're doing is extraordinary, it's certainly challenging. That doesn't mean all of those hours would then meet the definition because you have to distinguish in order to allow this and have what they're asking for be legal in the first place. You have to establish definitions for that. And that is clearly a process for CMS. You have to go in the state. Excuse me, but what you seem to be saying is that any waiver, as I understand it, would be in essence beyond the reach of the integration mandate under the ADA and Rehabilitation Act because compliance would require all of this hard work that would amount to a fundamental alteration in the program. What am I missing? I disagree with that. Please. You certainly could decide that any amended waiver We're not going to decide that all waivers are immune from the integration mandate.  So I think this case is different for at least two reasons. There is a federal regulation that absent going through this process bars the LRI provision of attending care services. That is not the case for other options under the waiver. It is not the case that just the state by itself can check that box. There's a federal regulation that prohibits it. That's not going to be the case. Is that 441.360D? Yes. Give us your second reason. 440.167.  That's what I was referring to. The other piece of this, I will say, is I think in most instances, many instances, what the plaintiffs seek is not going to be so specific as we need a waiver amendment. For example, in Stimel, the court on remand would not have had to structure a remedy that necessarily required amending the waiver. And here, plaintiffs have conceded the only legal path forward to give them what they are seeking would require an amendment to the waiver. I am well into my rebuttal time. We'll give you some more time on rebuttal. If you want to spend a couple minutes to address the Medicaid Act claim. Certainly. I can be brief about that, Your Honor. Our position is that FSSA has complied with its obligations under Medicaid law. The OB decision sets forth states must do something. In that case, there was nothing. Here, FSSA has taken reasonable steps to identify nurses for these individuals. We have a list of providers. We have care managers who work with the individuals to do this. In this particular instance, we had several thousand individuals transitioning over to this new framework to correct the out-of-alignment with the service care definitions. And the vast majority of them have gone through that transition process. 68% of them have transitioned to structured family caregiving. The rest have non-LRI attendant care, or they have found nurses. And it's our view that in this situation, we have complied with the obligations under Medicaid law to make services available. And to the extent they aren't, they are for reasons that are outside of FSSA's control, either situations specific to these individual plaintiffs. We've highlighted since the court's order, there have been demanding schedules. For example, ER is requesting that nurses provide 12-hour shifts on the weekend. That makes it difficult to find a service provider. And to the extent there's a national nursing shortage that the district court agreed with, plaintiffs agreed with, we've cited evidence for that. As much as we may want to, an order from this court is not going to solve that problem. You seem to be arguing that plaintiffs are not at risk, at serious risk of institutionalization, a subject we haven't talked about yet this morning. Put aside, for the moment, questions about appellate review of district court's findings on that point, particularly at a preliminary injunction stage. But you seem to be arguing that the plaintiffs are not at serious risk of institutionalization because they have not been using all available hours for skilled nursing care. Is that right? That's a piece of it. I don't think it's accurate to boil it down to just that. We, in a declaration from FSSA's medical director, who looked at the information they would typically submit. This is Dr. Fennell? Yes, it's Dr. Fennell. Did she ever examine these boys? No, but she's not giving a medical opinion, Your Honor. She's looking at the same information that the agency would look at when you're evaluating how many hours of service do they need, what type of care fits. It's certainly not a medical opinion. Doctors do not typically examine enrollees at this point in the process. What kind of an opinion is it? It's an opinion about what level of services are appropriate based on the information that has been submitted. She used her medical training, I assume? Yes, she did. Okay, sounds like a medical opinion to me. Certainly. I just want to be clear, she's not diagnosing them. It's not that type of medical opinion. Appreciate the clarification. She outlines in her declaration different ways that plaintiffs might be able to have their needs met. We think all of those are viable. Have you thought about bringing the schools into the case? You want to say, well, the plaintiffs aren't getting all the help they need that they're entitled to from the schools, right? Why not bring them into the case, too? I suppose we could consider that. They're not part of the case right now, and it's our position that Medicaid should not be obligated to fill that gap, right? That's not a Medicaid issue of whether schools are provided. In the position of these families, you're looking for all the help you can get from all those different directions, right? I thought I did read in your briefs you were arguing that the plaintiff's failure to use all available hours for skilled nursing care tended to show they were not at such serious risk of institutionalization. What did I miss? If you look at their historic usage, right, there are points in time prior to their mothers ever becoming LRI providers for attendant care where these individuals were not institutionalized. They were doing so without all these hours of nursing. We suggest the past is likely a better picture. Do you think the national shortage of nurses might have had anything to do with that inability to employ people for all those hours? I think it's certainly possible, but I don't think that's outcome determinative here. It just tends to undermine the argument that the failure to use all those hours tells us anything very material. I think it demonstrates that these individuals have not been institutionalized before. Given that everybody else who has gone through this process has transitioned to something else, FSSA is certainly optimistic that these two individuals would be able to do that as well, and it's not surprising that that has not gone through already. These individuals are receiving tax-free near six-figure salaries to care for their own children, right? They're not incentivized to go through that process. We are optimistic given what's in the record. Counsel, when you say the six-figure salary, the mothers are employed by an agency that takes a cut of that, correct? Somewhere between 30% and 40%. So the numbers in the state's briefs are a little inflated. There is evidence in the record that certainly one of them I think is over $100,000. The other one is slightly under. It's tax-free. There's a provision that says when you're providing this care, it's not. But they don't get that entire amount. That's the amount paid to the agency, and the agency takes a percentage cut. Am I understanding that correctly? You are understanding that correctly. I still think the totals get to what we recited. But, yes, that is correct. Let me just check something. Oh, yeah, I did want to ask you about a hot subject lately in this court, in the Supreme Court, has been the use of Section 1983 to enforce various provisions in the Medicaid Act. And the Supreme Court heard an oral argument on a case along those lines last week. If Section 1983 is not available for these provisions, what effect would that have on the district court's injunction, given the reliance as well on the ADA and Rehab Act? So I think that would, our position, that that would resolve the entire case on the one hand. The Medicaid claims would, therefore, be out. And our view is that, as we explained in the papers, what plaintiffs truly seek here is a rate increase, which would also be barred. They're not seeking that. They're not going to get it under Armstrong. But I don't see how a decision on the availability of 1983 affects claims under the Rehab Act or the ADA. So I guess two points. One, it's our position that what they're seeking is, in fact, a rate increase that is not redressable by the ADA. So I think there is an avenue to get to that. If the 1983 claims under Medicaid are barred, you cannot run around that by bringing an ADA claim. Our view is the ADA does not speak to the rates. You could imagine just two similarly situated individuals whose medical needs are essentially the same, but then we're looking at, well, what is your family situation? How much money does your parent make? What are the other needs in your family? The ADA does not dictate and speak to that situation. Setting that aside and assuming you have an ADA claim, our position, as previously explained, is that what plaintiffs seek is not a reasonable accommodation under Vaughan. It requires you to go outside of the waiver. We just stay under the ADA. Yes, and fundamental alternative. The case does not necessarily depend upon Section 1983. If you view it that way, no, it does not. Thank you. Anything else? No. Thank you. Thank you. We'll give you two minutes for rebuttal. Appreciate it. Mr. Rose. Thank you, Your Honor, and may it please the Court. The State cites 42 CFR 440.167 as authority for its proposition that federal regulations do not allow for the provision of LRI-provided attendant care. The first eight words of that regulation are, unless defined differently for purposes of a waiver, quite clearly I think everyone acknowledges that this is something the State could do and can be compelled to do under the ADA. In fact, its current H&W waiver document contains a definition of extraordinary care. It just does so under the rubric of structured family caregiving rather than attendant care. The State's, I believe, vastly overstating what would be necessary to bring its waiver document into compliance with the ADA. So much of its argument depends on its insistence that when the Medicaid Act allows it to do something, the ADA and the integration mandate cannot compel it to do something else, and that simply is not the law. This Court explicitly rejected that argument in Stimel. If that argument is correct, Radishevsky was wrongly decided. Obviously, the Medicaid Act allows for the removal of home nursing. At least for adults. The CMS's technical guide, which says that when we approve a waiver, this says nothing whatsoever about your compliance with Olmstead. That means nothing. And a wide array of similar cases simply cannot stand because this is how states provide home and community-based services. Mr. Rose, could I ask you to back up and go back to the last question I was asking Ms. Mathis about what happens to your case if Section 1983 is not available for the particular provisions of the Medicaid Act you rely upon? Of course, Judge. And depending on what the Supreme Court does with the Planned Parenthood case, we acknowledge that that could sound the death knell in our Medicaid Act claims. It has no bearing whatsoever on our Olmstead claim, which I think everyone acknowledges is at least the lead claim. We'll see. Well, we're all pretty familiar with Tlaibsky, and it's St. Anthony Echoes in this court. So we'll see what happens. Of course, Judge. Mr. Rose, under your theory, so as I take it, the regulations provide the state, I think we all agree, with an option to define extraordinary care, and thereby at least to the extent that it defines extraordinary care, to reimburse LRIs to provide that care, right? Under your theory, though, wouldn't the state have to do that under the ADA for everyone in your situation? In fact, wouldn't every state need to do that? And so how does the may become a must, and how do we navigate that? The serious risk assessment under Olmstead is always going to be an individualized one. We know, and the district court found, that these two plaintiffs are at risk of institutionalization without that. The fundamental alteration prong is a macro, views the situation globally. If the state does this, is it going to fundamentally alter its program, given its need to provide this care to a wide variety of persons with different disabilities? The state has every opportunity, had every opportunity, to demonstrate to the district court, to this court, that requiring it to do so would fundamentally alter the nature of its program. At this point, it can't even tell this court, couldn't tell the district court, how many LRIs were providing attendant care to their loved ones prior to the change at issue in this policy, in this case. I see. So just so that I understand where we are in the answer. So what you're saying is that the state has an obligation, under your theory, that for every individual who is in serious risk of institutionalization, they need to define extraordinary care and reimburse under that scenario, unless they can prove that doing so would be a fundamental alteration. So they always have that safety valve. And if I could add to that, Judge, there is absolutely nothing in our argument that says that the state can't prioritize structured family caregiving or any other service to the extent that those services will ward off the potential for institutionalization. We've given the hypothetical of two-income households who might not feel the limitations of structured family caregiving as acutely as these plaintiffs. For those persons, structured family caregiving might be a perfectly viable alternative. And there's nothing in our argument that says that the state cannot prioritize that service over attendant care for persons whose needs can be met with that service. There is something supremely counterintuitive about the position that the state has taken, both in this policy and in this case. Ms. Carter and Ms. Knight are filling a gap that exists in Indiana because they have not been provided nurses. I think everyone acknowledges there's a nursing shortage that makes that difficult. And because their children simply cannot be attended to by someone who has not been specifically trained to meet their needs. They're the only available providers of critical services for their children. And at the same time that the state is no longer allowing them to provide attendant care, it is more than happy, as the court noted, to pay a grandmother, an uncle, a neighbor, a family friend to provide the exact same services for whatever period of time is necessary when these women have to obtain a job outside the home. If and when nurses are actually located, it is more than happy to pay for those services at a rate much higher than what is paying the plaintiff's mothers for whatever period of time is necessary to let them return to work. If either of the plaintiffs had fewer needs, such that they could be attended to by an untrained, unskilled caregiver, the state would be more than happy to pay for either attendant care or a home health aide through the traditional Medicaid program for whatever period of time is necessary to ensure that these children remain safe. And it is not and has never been our position that there is not some aspect of normal parenthood to the extent that such a thing exists that these women cannot be required to do on behalf of their children. I think we have two things to look at so far as that's concerned. The first is that the state by regulation never pays for medically necessary services. It's the one that has reached the determination that the service levels these children are receiving is appropriate for them. But even putting that to the side, if we look at the state's home health policy, which is in the record as a part of docket 28-3 at UCF page 58, it specifically says that for children, at least children with significant needs, in single caretaker families, when that caretaker has to work outside the home, as my client's mothers will be required to do so, it is willing to pay up to 12, 16 hours a day in order to provide services to these individuals. Ms. Carter and Ms. Knight are filling a gap that exists in Indiana. This is not a case where they would simply prefer to be their children's providers. They're the only option that these children have right now. Mr. Rose, for decades, home health care has been a great concern of state policymakers and budget officials because it can become a kind of black hole, particularly with entitlement, framed as an entitlement. And it's not surprising that there are serious efforts to try to get those expenses under control. As I understand, this injunction applies to these two families, correct? That's correct, Judge. So the state is telling us that there are something like 21,000 patients who have been receiving attendant care from family members, if I've got that right. I think that might be the number of persons who have been receiving attendant care, not necessarily just from family members. Okay. And I guess you heard what your colleague on the other side had to say, and it's hard for us, I think, or for the district judge, to look at this case without thinking about fiscal consequences. How far does the logic of your position take the state in providing this care under the ATTC rates? Judge, I've known Ms. Mappas long enough that I feel comfortable speaking for her. I think if you ask the state, they would tell you that one of the problems that has given rise to its fiscal concerns is that FSSA may not have been exercising the oversight that it is entitled to exercise over individual service plans, whether those persons are- I thought I heard that at least laced into the discussion, and that's what accounted for the policy change. Whether the service providers are their parents, are their LRIs or not, certainly we acknowledge that every waiver must go through this cost neutrality analysis, and at some point there's going to be- at some point something becomes no longer approvable as a waiver if it ends up costing more in the community than- But we also have the problem of costing more compared to what? And if institutional care is the alternative, my understanding is that that's going to be much more expensive than any of these home care alternatives. That's absolutely right, and I think the state's argument very much depends somewhat tragically on parents bending over backwards because they love their children. They do not want this outcome for their children, but they simply are not able to provide structured family caregiving. They are not able to service providers of that service, and just like any other community-based service, when the state fails to ensure the availability of providers, we are at that place where there is a serious risk, practically a certainty of these children's institutionalization. Could you tell us, and Ms. Mappas on rebuttal perhaps you can tell us as well, we're having this debate in the briefs about, in essence, whether federal financial participation will be available for the care that the- reimbursement that the district court has ordered. Is there, in our current record, any indication from federal authorities that they would not reimburse the court-ordered care here? No, of course not, Judge, and even prior to the court order, the federal government has been reimbursing this care for years. We do believe that there's something incongruous about the state's position. Obviously, no one stands to benefit more than the state of Indiana by holding that the federal government is required to pay for this care. I understand that, but also it's certainly a powerful, a potentially powerful argument that the preliminary injunction is ordering the state to violate federal law. And, Judge, we don't think it is. Obviously, we agree that the preliminary injunction compels the state of Indiana to act in contravention of its current H&W waiver document. If the state really is concerned about the potential loss of federal funding, and again, I don't think there is any realistic concern about that issue, it has the ability to cover its bases by amending the waiver document in order to ensure. Or by Section 250 of the regs. Sorry, Judge? By Section 250 of the regs. Or through the, if that's the regulation requiring records or court-ordered services, certainly. And we think that that regulation is obviously directly on point. We've tried to address each of the state's arguments that it is not, by citation to decisions from the Health and Humanity Services itself, applying that regulation to situations not contemplated by the state. So I guess that raises a good issue with regard to 431.250. You know, looking at actually the paper copies of it, which I think is helpful when you look at some of these things because there's so many subtitles. You know, one of the points that the FSSA makes is that that provision falls under subpart E, which talks about fair hearings for applicants and beneficiaries. And certainly nothing in the federal regulation publications when the predecessor of the rule was first proposed, adopted, when the amendment was adopted. Nothing there indicates an intention to have this regulation go outside of the public fair hearing regulations. I guess number one, I guess two questions. Number one, what is your best argument that it does have that effect? Because we couldn't find any, at least circuit court cases that recognize that. And number two is, assuming that you're wrong, does it really matter here? The answer to the first argument is that we did cite to the court an administrative decision by HHS applying that regulation to circumstances that did not arise through the administrative appeal process. And in fact, I don't believe the case law cited by the parties, Heckler and the Illinois case, while obviously concluding that the services in those particular cases were not reimbursable, I don't believe that those arose under the traditional appeal process either. And the answer to the second question, which does it matter, I don't think so, Judge. Again, no matter what the regulation means, I don't think anyone views the loss of federal funding as a realistic eventuality here. The feds have been paying for this for years. The state has not cited, as we noted in our brief, to a loss of funding that happened after Bontrager issued, after BN issued. It's not new for provisions of either a state plan or a waiver program to be invalidated. And I think it is fairly uniformly accepted that when a court orders you to continue providing those services, the federal government will continue to reimburse those services. So you said that the CMS approval specifically states that the approval does not address kind of concerns or the state's obligations under the ADA, right? Is there a particular site for that? Judge, that's verbatim from the CMS technical guide that it disseminates to the states. CMS's role in approving a waiver is to decide, does this comply with the Medicaid Act? It has no role in deciding, does this comply with the ADA, with the Rehabilitation Act? And as I say, it's explicit about that. Is it correct, Mr. Rose, that before this latest policy change, I think it's the A&D waiver that existed before? It was the A&D waiver. And the state was providing services that were not necessarily compliant with that? That's correct, Judge. And federal financial participation was provided for those services, correct? There's certainly nothing in the record to indicate that the federal government stopped paying for those services. Very briefly, the parties have briefed what we view as the shortcoming in the relief initially ordered by the district court. The district court obviously felt itself initially hamstrung by the fact that the federal government had not approved the waiver program. In so doing, it issued an initial injunction that I think everyone agrees, or at least the facts demonstrate, was not adequate to remedy the Olmstead violation itself. We think that the relief has to be modified to something similar but not identical to the state pending appeal. As we indicated in briefing, we also think there are problems with the district court's determination of at what point skilled nursing, at what point my client's providing services will actually give away to skilled nursing. So we think that the relief has to be modified here, but in all other respects. If I understand your position, Mr. Rose, and help me, but you're pretty happy with the order that was put in place pending appeal, correct? That's correct, Judge. That corrected the biggest shortcomings that you were worried about. That is correct. And what's still at issue in your cross-appeal is you're urging the court to order, in essence, an overlap where these mothers would be paid for training skilled nurses if and when they become available. Both an overlap and that's certainly one additional thing that we're still seeking. The other problem, I think, is that the district court decided that the ability of Ms. Carter and Ms. Knight to continue providing services goes away the second that Ms. Carter, the ER, gets 40 hours of home nursing, that GS gets 80 hours of home nursing. This might be a complete hypothetical because they don't have nurses yet, but those numbers were taken from what they had previously received during a period of time when their mothers were allowed to provide care. That says very little about the level of services that they need when their mothers return to work outside the home, as they will be required to do. Those concerns all sound fairly hypothetical at this point. The kinds of things that could be addressed by the district court while the case is still pending. And they very well may be, and what we did urge in our briefing is a remand to the district court to redetermine the appropriateness of those 40 and 80-hour numbers. Thank you. Thank you, Judge. Thank you, Mr. Rose. Thank you. Ms. Mappas, we'll give you two minutes. Thank you, Judge. I'd like to start by just pointing to a couple of record sites to respond to what was discussed and then a couple of argument points. About your question for yearly salary, I can point to some record sites. The plaintiff's mother's affidavits at Docket 28-7, Paragraph 27, and Docket 28-8 at Paragraph 30. One of them, for example, says, I make approximately $2,000 a week. So that is translated into her take-home pay. I would also like to point again to Paul Bowling's declaration at Docket 38-4, Paragraph 6. He specifically talks about the fiscal impact and the number of individuals who were receiving LRI-provided attendant care, and he notes that attendant care services expenditures were projected to be $172 million for fiscal year 2024 for 1,622 recipients, which is an increase of 195% from the year prior. Judge Hamilton, you had asked about federal financial participation and whether there was any indication that it would not be paid. There's not any indication that it won't be paid, but there's not any indication that it will. Our view is this is a legal question and not a factual question, and this is answered by Vaughan. Right? And Vaughan recalled that that plaintiff wanted the ability to self-direct her care. That was not something that was allowed under the existing waiver, and just as that was outside the waiver and the court specifically said in Vaughan the state does not have to fund this itself, it would have to go outside of the waiver. We believe that analysis in Vaughan answers this question and says the state does not have to provide some nonexistent service out of its own dollars when the Medicaid program does not allow for that. Right. In Vaughan, if I recall correctly, that was the injunction ordered the state to pay somebody about 50% higher rates than the Medicaid program allowed, right? Maybe. I don't recall that. It was way out of bounds as an injunction goes. I appreciate that, but the court's description was this is outside the waiver and the state is not obligated to pay it itself, and we believe that analysis dictates the outcome here. Okay. I see I'm out of time. Thank you very much. Thank you, Ms. Davis. Thank you, counsel. The case would be taken under advisement.